# United States Court of Appeals
## For the First Circuit

No. 18-1937

SUSAN SUTARSIM, a/k/a Phan San San;
RUDIJANTO LUKMAN; FELCIA LNU; JESSLYN LNU,

Petitioners,

v.

WILLIAM P. BARR,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Selya, and Barron,
Circuit Judges.

Kerry E. Doyle and Graves & Doyle on brief for petitioners.
Laura Halliday Hickein, Trial Attorney, Office of Immigration
Litigation, Joseph H. Hunt, Assistant Attorney General, Civil
Division, and Shelley R. Goad, Assistant Director, Office of
Immigration Litigation, on brief for respondent.

May 1, 2020

**LYNCH**, **Circuit Judge**.  In 2008, Susan Sutarsim applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") for herself, her husband Rudijanto Lukman, and her two daughters, Felcia and Jesslyn.[1]  An immigration judge ("IJ") denied the application in 2011, and the Board of Immigration Appeals ("BIA") affirmed that denial in 2012.  Six years later, in 2018, Sutarsim filed an untimely motion to reopen the family's removal proceedings, which the BIA denied.  She now petitions for review of that denial.  We deny the petition.

I.

Sutarsim and her family are natives and citizens of Indonesia.  They were admitted to the United States on June 28, 2008, on six-month nonimmigrant visitor visas.  On July 8, 2008, Sutarsim submitted an application for asylum, statutory withholding of removal, and withholding of removal under the CAT.  The application alleged that the family faced harm in Indonesia based on their Chinese ethnicity and Buddhist religion.  On January 8, 2009, the Department of Homeland Security issued a notice to appear charging the family as removable under 8 U.S.C. § 1227(a)(1)(B) for having overstayed their visas.  In response,

---

[1]    Because the claims of Lukman and Sutarsim's two daughters are derivative of Sutarsim's claims, we refer to all four together as "the petitioner."

Sutarsim admitted the allegations in the notice to appear and conceded that the family was removable.

On January 11, 2011, an IJ held a hearing on the merits of Sutarsim's asylum claim. Sutarsim and Lukman both testified, and the IJ found them both "generally credibl[e]."

At the hearing, Sutarsim and Lukman testified as follows. Their family is ethnic Chinese. When Sutarsim was a child, other children at school would harass her by calling her Chinese and chasing her. In May 1998, radical Islamists terrorized the Chinese community in Indonesia. Sutarsim witnessed the Islamists' riots in Jakarta but was able to get home unharmed.

On March 29, 2007, Sutarsim and Lukman were in their car and came upon an angry demonstration by an Islamic extremist group. One demonstrator touched their car, and Lukman rolled down the window and asked him to be careful. The demonstrator replied, "What's the problem, you Chinese? Get out." The demonstrators then attacked the car, breaking a mirror and cracking the front window. When Lukman then got out of the car, the demonstrators attacked him, stabbed him, and stole his wallet. Lukman required stitches on his chest. He later believed that some of the demonstrators were stalking his house, having found it from the information in his wallet, as a means of threatening him.

On June 1, 2008, Sutarsim and Lukman were again in their car and encountered bad traffic. They saw people getting beaten

up.  Because Sutarsim felt afraid, they turned the car around and went home.  They later learned from the news that they had encountered another demonstration by the same Islamic extremist group.

Because of these incidents, the family left Indonesia for the United States on June 28, 2008.  They feared that they would continue to be the target of ethnic violence if they were to return to Indonesia.

The IJ denied Sutarsim's application, finding that she had not established a well-founded fear of persecution.  The IJ found that Sutarsim was not the victim of past persecution because the May 1998, March 2007, and June 2008 incidents did not "cause[] harm to [Sutarsim] such as to rise to the level of persecution."  The IJ found that the May 1998 rioting was a manifestation of "general national unrest" that "was eventually quelled by the government" and "was not directed at [Sutarsim] in the form of persecution."  As to Lukman, the IJ found that the March 2007 attack on him "might cause [Sutarsim] to have a well-founded fear of persecution upon her return to Indonesia," but that Lukman had not submitted an independent asylum application and stayed in Indonesia for nearly a year after the attack.  The IJ found that "discrimination against ethnic Chinese in Indonesia" was not "so pervasive and intolerable and either government-directed or condoned as to be tantamount to persecution."  Finally, the IJ

found that Sutarsim had not established that it was more likely than not that she would be tortured if she returned to Indonesia and that the torture would be inflicted by or with the acquiescence of a public official.

On January 21, 2011, Sutarsim filed a motion to reconsider with the IJ, which was denied on January 25, 2011, without opinion.

Sutarsim then appealed to the BIA both the merits decision and the denial of the motion to reconsider. On June 20, 2012, the BIA affirmed the IJ's merits decision. It found that "the incidents [Sutarsim] described, while frightening, did not rise to the level of persecution because they lacked severity or they were isolated acts of criminal conduct or lawlessness." It also found that Sutarsim "failed to show evidence that she was individually targeted because of her ethnicity." Finally, the BIA found that Sutarsim had not shown a likelihood that she would be tortured if she returned to Indonesia. The BIA also affirmed the denial of the motion to reconsider. It held that Sutarsim had not produced new material evidence not available at the merits hearing.

On July 19, 2012, Sutarsim filed with the BIA a motion to reconsider its decision dismissing her appeal of the IJ's denial of the motion to reconsider. The motion argued that the IJ's failure to explain the motion's denial was error that required remand. On October 23, 2012, the BIA granted the motion and

- 5 -

remanded the case to the IJ.  On January 25, 2013, the IJ again denied the motion to reconsider.  The IJ held that Sutarsim had not submitted any new evidence that was not available at the time of the merits hearing.

On February 25, 2013, Sutarsim appealed the second denial to the BIA.  On February 23, 2015, the BIA dismissed the appeal.

On May 31, 2016, Sutarsim's daughters voluntarily identified themselves to Immigration and Customs Enforcement ("ICE"), surrendered their Indonesian passports, and submitted to voluntary monitoring.  They were released as part of Operation Indonesian Surrender, "a humanitarian program initiated by [ICE]" under which "Indonesian nationals subject to final orders of removal could make themselves known to ICE and, in ICE's discretion, receive temporary stays of removal, accompanied by renewable orders of supervision."  Sihotang v. Sessions, 900 F.3d 46, 49 n.1 (1st Cir. 2018).  On February 8, 2017, ICE denied the daughters' applications for another stay of removal and later ordered them to report with plane tickets back to Indonesia.

On April 12, 2018, Sutarsim filed with the BIA an untimely motion to reopen the removal proceedings, alleging that materially changed conditions in Indonesia excused her failure to comply with the filing deadline for motions to reopen.  The motion

alleged that violence against and intolerance of religious minorities had escalated since 2011.

On August 31, 2018, the BIA denied the motion as untimely.  It found that Sutarsim's evidence did not show a material change with respect to Chinese Buddhists.  Specifically, the BIA concluded:

> The respondents have not shown that an extremist group has directly threatened them or any family member since their hearing in 2011.  Although there is some religious violence in Indonesia, the evidence presented with the motion [to reopen] largely reflects ongoing sporadic terrorism and mistreatment of Chinese Christians, as opposed to Buddhists, and is similar to what existed before the respondents' 2011 hearing.  Further, the respondents have not demonstrated a pattern or practice of persecution against Chinese Buddhists in Indonesia.

(citations omitted).

On September 28, 2018, Sutarsim timely filed a petition for review with this court.

## II.

"Motions to reopen removal proceedings are contrary to 'the compelling public interests in finality and the expeditious processing of proceedings' and are thus disfavored."  Bbale v. Lynch, 840 F.3d 63, 66 (1st Cir. 2016) (quoting Roberts v. Gonzales, 422 F.3d 33, 35 (1st Cir. 2005)).  We review a denial of a motion to reopen for abuse of discretion.  See Roberts, 422 F.3d at 35.  The petitioner must show that the BIA committed an error

of law or acted "in an arbitrary, capricious, or irrational" manner. Raza v. Gonzales, 484 F.3d 125, 127 (1st Cir. 2007). We must accept the BIA's factual findings as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Hasan v. Holder, 673 F.3d 26, 33 (1st Cir. 2012) (quoting Guzman v. INS, 327 F.3d 11, 15 (1st Cir. 2003)).

Motions to reopen removal proceedings must generally be filed within ninety days of the final administrative order. 8 C.F.R. § 1003.2(c)(2). But "a petitioner may file a motion to reopen at any time if he brings the motion seeking to apply for asylum based on changed circumstances arising in the country of nationality." Xin Qiang Liu v. Lynch, 802 F.3d 69, 75 (1st Cir. 2015) (citing 8 C.F.R. § 1003.2(c)(3)(ii)). To be eligible for this exception, a petitioner must demonstrate "that the change in country conditions is material and must support that showing by evidence that was either unavailable or undiscoverable at the time of her merits hearing." Nantume v. Barr, 931 F.3d 35, 38 (1st Cir. 2019) (citing Garcia-Aguilar v. Whitaker, 913 F.3d 215, 218 (1st Cir. 2019)). She must also "show prima facie eligibility for the substantive relief that she seeks." Id. (citing Chen v. Lynch, 825 F.3d 83, 87 (1st Cir. 2016)). These requirements apply equally to a petitioner's claims for asylum, withholding of removal, and CAT protection. Id.

- 8 -

The petitioner argues that the BIA's denial of her motion to reopen was an abuse of discretion. In doing so, she relies heavily on two arguments not available to her before the BIA because they arose after the BIA decision. She first argues that the BIA has reached "conflicting outcome[s]" in her case and other "virtually identical cases." She argues that, in August 2018, the BIA reopened twenty similar cases of individuals and families who had participated in Operation Indonesian Surrender. From this, she argues that the BIA's "disparate treatment" in not reopening her proceedings was arbitrary and capricious.

The cases the petitioner offers are cases in which the BIA reopened the proceedings of Indonesian citizens who were Chinese Christians based on new evidence submitted in those proceedings of worsening conditions for Chinese Christians in Indonesia. The petitioner argues that she submitted "evidence of significant radical Muslim groups attacking non-Muslims from religious minorities in Indonesia." But the BIA stated that Sutarsim's family is Buddhist, not Christian. It found that the evidence submitted with Sutarsim's motion to reopen did not demonstrate changed conditions in Indonesia for Chinese Buddhists. The BIA's conclusion that Sutarsim had not met her burden to show

changed country conditions was far from arbitrary and certainly not an abuse of discretion.[2]

The petitioner secondly argues that this court's decision in Sihotang, which was decided after her motion to reopen was filed, requires a contrary conclusion. Not so. The petitioner in Sihotang was an Indonesian national and evangelical Christian "for whom public proselytizing [wa]s a religious obligation." 900 F.3d at 50. He moved to reopen his asylum proceeding, arguing that conditions in Indonesia had deteriorated for evangelical Christians. Id. at 49. He submitted copious evidence of these conditions that specifically described risks faced by evangelical Christians, as compared to other Christians, and to Christians attempting to practice their faith in public. Id. at 51-52. The BIA denied his motion, finding that "he had shown nothing more than the persistence of negative conditions for Indonesian Christians." Id. at 50. This court vacated the BIA's decision, holding that the BIA had "wholly failed to evaluate whether . . . there [wa]s a meaningful distinction between Christians who

---

[2] The petitioner also claims that the BIA reopened proceedings in two other cases "solely because" they involved "named parties in" district court litigation challenging ICE's decision to remove aliens who had previously received stays of removal through Operation Indonesian Surrender. See Devitri v. Cronen, 289 F. Supp. 3d 287, 290-91 (D. Mass. 2018). But the government had not responded to the motions to reopen those two cases, and the district court had entered a preliminary injunction staying their removal. Those cases do not bear on the outcome of this case.

practice their faith in private and evangelical Christians . . . for whom public proselytizing is a central tenet." Id. By contrast, the petitioner in this case has not submitted any specific evidence that Buddhists, or Chinese Buddhists, now face heightened risks in Indonesia. Rather, she points exclusively to evidence of heightened risks faced by Christians and generalizes from there that all religious minorities face higher risks.

The petitioner also argues that the BIA's mistaken claim in its decision that no asylum application was included with the motion to reopen requires remand. It is true that the BIA's decision incorrectly states that the petitioner did "not submit[] a new asylum application with [her] motion" even though a new application was attached to the motion. But the petitioner points to no substantive information in the new application that the BIA ignored, and the application itself appears to include none. The answers on the application state only "Please See Statement," but no statement is attached. Even if the BIA failed to consider this application, the application would have provided no basis for the agency to reach a different decision on remand.

III.

The petition for review is denied.

- 11 -